## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| LR TRUST, On Behalf of Itself and All Others Similarly Situated, | ) ) ) Case No. 2:14-cv-612 |
| Plaintiff, | ) ) **VERIFIED DERIVATIVE AND** |
| v. | ) **CLASS ACTION COMPLAINT** ) |
| NICHOLAS DIPAOLO, DAVID P. LAUER, DAVID L. NICHOLS, JANICE E. PAGE, GREG A. TUNNEY, THOMAS M. VON LEHMAN, and HARVEY A. WEINBERG, | ) **Judge** ) ) ) ) |
| Defendants, | ) **JURY DEMAND** ) **ENDORSED HEREON** |
| – and – | ) ) |
| R.G. BARRY CORPORATION, an Ohio Corporation | ) ) ) |
| Nominal Party. | ) ) ) ) |

Plaintiff LR Trust ("Plaintiff"), by its undersigned counsel, alleges the following upon information and belief, except as to those allegations pertaining to Plaintiff which are alleged upon personal knowledge:

### NATURE AND SUMMARY OF THE ACTION

1.     Plaintiff, a holder of common stock of R.G. Barry Corporation ("RG Barry" or the "Company"), brings this action individually and derivatively against the Company and the members of the Board of Directors (the "Board"), for violations of sections 14(a) and 20(a) of

the Securities Exchange Act of 1934 ("Exchange Act"), and seeking relief for the Defendants' breaches of fiduciary duty and other violations of state law arising out of the Board's agreement to sell the Company to Mill Road Capital II, L.P. ("Mill Road") through its wholly owned subsidiaries, MRGB Hold Co. ("Parent") and MRVK Hold Co. ("Merger Sub") (the "Proposed Transaction").

2.      On May 1, 2014, RG Barry and Mill Road issued a joint press release announcing entry into an Agreement and Plan of Merger dated May 1, 2014 (the "Merger Agreement") to sell RG Barry to Mill Road, whereby Mill Road will purchase all of RG Barry's outstanding common shares at a purchase price of $19.00 per share (the "Merger Consideration"). The Proposed Transaction is valued at approximately $215 million.

3.      The Proposed Transaction is the product of a hopelessly flawed "process" that is designed to ensure the sale of RG Barry to Mill Road, the Company's largest shareholder with a 9.8% stake in the Company, on terms preferential to Defendants and other insiders and will subvert the interests of Plaintiff and the other public shareholders of the Company. For example, certain RG Barry directors and executive officers will potentially secure over $8.6 million in the monetization of performance-based restricted stock units ("RSUs"), performance based cash award units, time-based RSUs, stock options, deferred share units, and golden parachute compensation only if the Proposed Transaction is consummated.

4.      Because of the Board's decision to enter into the Proposed Transaction, the benefits of the Company's long-term prospects will now flow to Mill Road and not to the Company's shareholders. Indicative of the unfair sale process and the Board's determination to sell the Company, the $19.00 Merger Consideration, which represents a mere 5% premium based on RG Barry's May 1, 2014 closing price of $18.10, is *$1.00 less* than the $20.00 per share unsolicited indication of interest the Company received from Mill Road on September 11, 2013.

5.      In further breach of their fiduciary duties, Defendants failed to accept a $21.00 Alternative Proposal (the "Alternative Proposal") that the Company received from a party identified in the Proxy as Party A ("Party A" or the "Excluded Party") during the "go-shop" period.  The Company announced on June 3, 2014 that it received an "Alternative Proposal" from an "Excluded Party" that could reasonably be expected to result in a "Superior Proposal" as defined in the Merger Agreement.  However, on June 18, 2014, the Company announced that the Alternative Proposal was no longer expected to result in a Superior Proposal, and therefore the third party is no longer considered an "Excluded Party."   The Alternative Proposal not only represented a 10.5% premium to the Merger Consideration, but included more favorable terms than the Merger Agreement, including Party A's agreement to stay bonuses for Company employees and payment of $15 million termination fee by Party A if a transaction did not occur. The existence of the Alternative Proposal and the Defendants' failure to pursue it further evidences the inadequacy of the Proposed Transaction and Defendants' disregard for the Company's public shareholders.

6.      RG Barry's Schedule 14A Preliminary Proxy Statement (the "Proxy"), filed with the U.S. Securities and Exchange Commission ("SEC") on June 12, 2014 and amended on June 23, 2014, omitted or misrepresented material information regarding the Proposed Transaction in violation of sections 14(a) and 20(a) of the Exchange Act and in contravention of the Individual Defendants' fiduciary duties under state law.  The Proxy failed to disclose material information regarding: (i) the process by which the Board entered into the Proposed Transaction; (ii) the key data and inputs underlying the financial valuation analyses that purport to support the fairness opinion ("Fairness Opinion") provided to the Company's Board by Peter J. Solomon Company L.P. ("PJSC"); and (iii) certain financial projections prepared by RG Barry and relied upon by PJSC in issuing its Fairness Opinion regarding the Proposed Transaction.

7.     For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction until such time as Defendants provide all material information critical for a fairly and fully informed shareholder vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Individual Defendants' violations of their fiduciary duties of care, loyalty, good faith, and independence.

8.     Accordingly, this action seeks to enjoin the Proposed Transaction and compel the Individual Defendants to properly exercise their fiduciary duties to RG Barry's shareholders.

9.     Plaintiff alleges that it, along with all other public shareholders of RG Barry common stock, are entitled to enjoin the Proposed Transaction or, alternatively, to recover damages in the event that the Proposed Transaction is consummated.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over all claims asserted herein pursuant to §27 of the Exchange Act because the claims asserted herein arise under sections 14(a) and 20(a) of the Exchange Act.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

11.     This Court has jurisdiction over Defendants because RG Barry is incorporated and headquartered in Ohio and each Defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper under 28 U.S.C. §1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

13.     Plaintiff is, and was all times relevant hereto, a shareholder of RG Barry.

14.     Nominal party RG Barry, an Ohio corporation, creates and markets accessories brands and fashionable, solution-oriented products.  The Company's primary brands include: Dearfoams slippers; baggallini handbags, totes and travel accessories; and Foot Petals premium insoles and comfort products.  The Company's common stock is traded on the NASDAQ under the symbol "DFZ."

15.     Defendant Nicholas DiPaolo ("DiPaolo") has served as a RG Barry director since 2005.

16.     Defendant David P. Lauer ("Lauer") was elected Interim Lead Director on February 1, 2014, upon the death of Gordon B. Zacks, the Board Chairman, and has served as a RG Barry director since 2003.  Lauer is a director of Huntington Bancshares Inc., the holding company of The Huntington National Bank, which is a lender under the Company's credit facility.

17.     Defendant David L. Nichols ("Nichols") has served as a RG Barry director since 2005.

18.     Defendant Janice E. Page ("Page") has served as a RG Barry director since February 2000.  Page served as a director of Kellwood Company from 2000 until 2008, and as a trustee of the Glincher Realty Trust.

19.     Defendant Greg A. Tunney ("Tunney") has served as RG Barry's President and Chief Operating Officer since February 2006, as Chief Executive Officer ("CEO") since May 2006 and as a RG Barry director since August 2006.

20.    Defendant Thomas M. Von Lehman ("Von Lehman") has served as a RG Barry director since 2005. Von Lehman served as interim President and CEO of RG Barry for approximately two years beginning in March 2004.

21.    Defendant Harvey Weinberg ("Weinberg") has served as a RG Barry director since 2001. Weinberg served as a director of Kellwood Company from 2004 until 2008, and as a trustee of the Glincher Realty Trust. Weinberg was also a member of the advisory board of Griffen Strategic Advisors LLC, an advisory firm that provided consulting services to the Company as recently as 2013. Weinberg is also executive Chairman of the Board of the parent company of Optimer, Inc. and Optimer Performance Fibers, Inc., which companies did business with RG Barry as recently as 2013.

22.    Defendants set forth in paragraphs 15 to 21 are referred to herein as the "Board" or the "Individual Defendants."

23.    Defendant RG Barry and the Individual Defendants are referred to herein as the "Defendants."

**OTHER RELEVANT ENTITIES**

24.    Mill Road is a private investment firm focused on investing in and partnering with publicly traded micro-cap companies in the U.S. and Canada. The firm has flexible, long-term capital with the ability to purchase shares in the open market, buy large block positions from existing shareholders, provide capital for growth or acquisition opportunities, or execute going-private transactions. The firm currently has over $600 million of assets under management.

25.    Parent is a corporation organized under the laws of Ohio and a wholly owned subsidiary of Mill Road.

26.    Merger Sub is a corporation organized under the laws of Ohio and a wholly owned subsidiary of Parent.

- 6 -

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action individually and on behalf of all holders of the common stock of RG Barry, and their successors in interest, who have been and will be harmed by the wrongful conduct of the Defendants as alleged herein (the "Class").  The Class excludes Defendants, and any person, firm, trust, corporation or other entity related to, affiliated with, or controlled by any of the Defendants, as well as the immediate families of the Individual Defendants.

28.     This action is properly maintainable as a class action.

29.     The Class is so numerous that joinder of all members is impracticable.  As of May 1, 2014, the total number of issued and outstanding RG Barry shares was 11,176,091.  Members of the Class are scattered throughout the United States and are so numerous that it is impracticable to bring them all before this Court.

30.     Questions of law and fact exist that are common to the Class and predominate over questions affecting any individual Class member, including, among others:

(a)     whether the Individual Defendants have fulfilled and are capable of fulfilling their fiduciary duties owed to Plaintiff and the Class, including, but not limited to, the duties of care, loyalty, good faith, and independence;

(b)     whether the Individual Defendants have breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and other Class members;

(c)     whether Plaintiff and the other members of the Class will be irreparably damaged if Defendants are not enjoined from continuing the conduct described herein, or alternatively, whether they have suffered compensable damages;

(d)     whether the Individual Defendants, in bad faith or for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets; and

(e)     whether the consideration payable to Plaintiff and the Class under the Proposed Transaction is unfair and inadequate.

31.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

32.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

33.     Preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate because Defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

## SUBSTANTIVE ALLEGATIONS

**Company Background and its Bright Future**

34.     The Company was founded in 1947 around the world's first foam-soled, soft, washable slipper.  Today, RG Barry develops consumer brands and markets consumer products in three areas of the retail accessories category: footwear (slippers and sandals), foot and shoe care products (cushioned insoles), and handbags, tote bags and travel items.  In fiscal 2013,

approximately 74% of the Company's consolidated net sales were generated through the sale of accessories-type footwear, RG Barry's core product since its founding.  The balance was primarily generated from the Company's newer, non-footwear businesses.

35.     RG Barry's business is divided into three Business Units:

(a)     Footwear, including slippers, sandals, hybrid and active fashion footwear and slipper socks.  RG Barry is one of the largest marketers of accessories footwear products and estimates that it sells approximately 30% of the slippers purchased at retail in the U.S. annually. In addition to the Company's principal brand, Dearfoams, RG Barry markets the following brands: Angel Treads, DF by Dearfoams, DF Sport by Dearfoams, Signature by Dearfoams and Utopia by Dearfoams.  The Company sells its footwear products through many retail channels including mass merchandisers, national chain stores, warehouse clubs, mid-tier department stores, specialty independent stores, discount stores and e-commerce and catalog retailers. Although U.S. sales account for the majority of RG Barry's sales, the Company also sells footwear in Canada, Mexico, Israel, Central America and Asia, and views foreign markets as potential drivers of future growth.

(b)     Foot Petals sells foot and shoe care products, including comfort inserts, primarily targeted toward the foot comfort of women between the ages of 14 and 55.  RG Barry sells its Foot Petals products under a variety of Company-owned brand names, including: Foot Petals, Fab Feet, Glamour Toez, Heavenly Heelz, Killer Kushionz, Tip Toes, Pressure Points, Amazing Arches, and Strappy Strips.  Foot Petals' products are primarily sold through mass-merchants, upper-tier department stores, independent retailers, internet and home shopping venues, as well as on-line.

(c)     Bagallini includes handbags, tote bags and travel products targeted toward women between the ages of 34 and 55.  The products are known for their lightweight

construction and intelligent, solution-oriented design. The Company's principal trademarks for this business unit include: bagallini and Le Bagg, KIVA, and Mosey. Products for this business unit are sold by Company representatives and independent sales representatives, as well as on-line.

36.    Underscoring the Company's positioning for long-term growth, on October 22, 2013, RG Barry issued a press release reporting that a federal lawsuit brought against RG Barry by Totes Isotoner Corp. in The United States District Court for The Southern District of Ohio had been dismissed with prejudice. The lawsuit alleged that slippers sold by RG Barry's Dearfoams brand were unlawfully copied from its competitor. In the October 22 press release, Defendant Tunney exclaimed, "[w]e have been fully vindicated . . . This was a frivolous suit brought by a competitor who was unhappy about losing market share to us. The Court was not persuaded by any of this competitor's arguments and found that the case was not likely to succeed on its own merits."

37.    In the first quarter ("1Q") of 2014, the Company's financial results suffered as a result of "shifts in the timing of its holiday shipments to retailers and the sluggish retail environment," according to the Company's November 5, 2013 press release. However, Defendant Tunney stated in the press release that RG Barry's business "has never been a quarter-to-quarter business," indicating that the financial results did not reflect the Company's future prospects. In the press release, Defendant Tunney further commented:

> We remain fully committed to our growth plan and strategy of investment in both existing and new businesses . . . While we continue to refine our model with a goal of balanced performance, we are not there yet. The real long-term solution for us lies in generating sustainable, profitable growth from channels such as e-commerce and international and expansion into new accessories product categories through acquisitions. Our strong operating cash flow and healthy balance sheet give us the flexibility to fund growth initiatives even in a challenging retail environment.

38.     The Company bounced back in the second quarter ("2Q") of 2014.  On February 4, 2014, the Company reported 2Q 2014 financial earnings, including net earnings of $6.1 million, or $0.53 per diluted share, versus $5.3 million, or $0.46 per diluted share for 2Q 2013. In the February 4, 2014 press release, Defendant Tunney stated:

> **We continue to lead our peer group in many key performance metrics** despite the challenging retail environment during the holiday selling season . . . Our proven model and operational excellence permitted us to generate healthy profitability, while investing significant resources in our brands and building a business that will continue to meet the challenges of both today and tomorrow.
>
> * * *
>
> **We remain committed to investing in long-term growth strategies** for areas such as international and ecommerce, both of which grew during the first half, and to actively pursuing growth through category appropriate acquisitions.  While the support of these strategies is expected to negatively impact profitability in the short-term, including the current fiscal year, **we are confident that, over time, they will generate levels of growth and profitability that will keep RG Barry Brands a leader in the accessories marketplace.**

(emphasis added).

39.     Similarly, the February 4 press release quoted Jose Ibarra, RG Barry's Senior Vice President Finance and Chief Financial Officer, as adding:

> We ended the half with a good retail sell-through. Our strategy of continuing to eliminate underperforming or lower margin components of the business impacted the top line, but gross margin as a percent of net sales improved by 110 basis points, despite the highly-promotional retail environment.
>
> We continue to experience economic headwinds and a challenging retail environment. While **the Company is financially strong and well positioned to meet its long-term goals**, these factors have led us to reaffirm our view that consolidated revenue this year will be down slightly compared with fiscal 2013.

(emphasis added).

**The Incomplete and Flawed Sale Process**

40.     The Proposed Transaction is the result of a hopelessly flawed sale process, driven entirely by Mill Road, the Company's largest shareholder.  Mill Road has actively sought to capitalize on the Company's long-term potential for over five years.  Mill Road sent its first

- 11 -

unsolicited indication of interest to acquire the Company for $7.75 per share in November 2008. Two months later, in January 2009, Mill Road again sent the Company an unsolicited indication of interest, seeking to acquire RG Barry for $7.00 to $7.50 per share. Shortly thereafter, Mill Road filed a Schedule 13D with the SEC reporting it owned approximately 5.0% of the Company's outstanding shares.

41. RG Barry rejected the January 2009 proposal and Mill Road eventually withdrew it. However, as a result of the November 2008 and January 2009 proposals, the Board decided to buttress its takeover defenses, including adding a poison pill, in a shareholders' rights agreement ("Rights Agreement").

42. Subsequently, Mill Road continued to increase its stake in the Company. In February 2011 Mill Road filed a Schedule 13D with the SEC reporting their ownership of 637,782, or approximately 5.8%, of the Company's then outstanding shares. Mill Road continued building its stake in the Company, reporting ownership of 641,286, or approximately 5.7% of the Company's outstanding shares in an Amendment No. 1 to Schedule 13D that it filed with the SEC in August 2012.

43. Then, on September 11, 2013, Mill Road sent another unsolicited acquisition proposal to acquire the Company at $20 per share (the "$20 Proposal"). That same day Mill Road filed Amendment No. 2 to Schedule 13D with the SEC, which reported the $20 Proposal and that Mill Road owned 968,189, or approximately 8.6%, of the Company's outstanding shares. Two days later Mill Road continued with its aggressive efforts and filed Amendment No. 3 to Schedule 13D with the SEC indicating that they had raised their stake in the Company to 1,093,189 shares, or approximately 9.6%, of the Company's then-outstanding common shares.

44. In an affirmation of the Company's bright prospects, Mill Road was on its third attempt to acquire the Company. Apparently, this time the Board thought Mill Road was serious

as reflected by its continuing purchase of Company stock. Wanting to avoid an embarrassing activist shareholder takeover in light of Mill Road's increased ownership, to the detriment of the Company's public shareholders, the Board was incentivized to liquidate the Company without a proper sale process.

45.     Other significant shareholders of the Company recognized the same dynamic and immediately started asking questions. On September 25, 2013, Cove Street Capital, LLC ("Cove Street") filed a Schedule 13D with the SEC reflecting its 4.2% ownership in the Company in order to share its letter to the Board dated September 18, 2013 with the Company's public shareholders. The letter stated, in pertinent part:

> To echo the thoughts of Mill Road Capital, we also think that Greg and his management team have done an excellent job and we agree with the Mill Road premise that it is difficult for a company the size of RG to achieve a premium value in the public markets.
>
> As to whether $20 is the 'right' price for an offer to take the company private, we profess no firm opinion. What we do strongly believe is that the Board of Directors should immediately hire a reputable investment banker and conduct an appropriately open process with the goal of establishing the 'correct' price for a transaction. In our opinion, the Board's public letter in response to Mill Road was vague as to the steps the company will undertake to evaluate the proposal. Furthermore, given the standard legalese involving such a process, publically stating the intention to hire said investment banker and subsequently conducting a thorough process to achieve the highest value for all shareholders seems like a reasonable and minimum hurdle to properly discharge the Board's fiduciary responsibility to shareholders.

46.     In response to Mill Road's $20 Proposal, in a letter dated September 30, 2013, the Board requested more clarity on Mill Road's financing capabilities, which Mill Road provided on October 2, 2013.

47.     Subsequently, during an October 4, 2013 Board meeting, the Board appointed an "ad hoc committee of directors" (the "Special Committee") to evaluate the $20 Proposal and to retain an investment banking firm to act as an advisor for the Company. The Special Committee consisted of Defendants Nichols, Chair, Lauer and DiPaolo.

48. On October 25, 2013, the Special Committee chose PJSC as the Company's financial advisor, to assist in evaluating the $20 Proposal and other potential alternatives available to the Company. Furthermore, PJSC is slated to receive approximately $3.52 million as payment for its services in connection with the Proposed Transaction, of which all (other than $750,000) is contingent upon completion of the merger.

49. In its very first meeting with the full Board on October 30, 2013, PJSC stated that they would evaluate and discuss with the Board various potential alternatives available to the Company, including remaining independent and executing their current strategic plan. In reality PJSC was pushing for a sale of company from the outset.

50. At the October 30, 2013 meeting, PJSC also reported that they had spoken with Scott Scharfman ("Scharfman"), a Management Committee Director of Mill Road's general partner, on October 29, 2013, and Scharfman had already advised that, among other things, Mill Road was interested in keeping RG Barry's current management team in place incentivizing RG Barry management to enter into a transaction with Mill Road.

51. Subsequently, the Company's management prepared five-year (fiscal 2014–2018) financial projections for PJSC to utilize in assessing the fairness of any transaction. The Board met on November 18, 2013 to review and discuss the projections before they were provided to PJSC for use in its analysis of the $20 Proposal and other potential strategic alternatives. During the meeting, management explained that the projections for fiscal 2014 had been updated from what was presented to the Board in late October 2013. The Proxy fails to provide any explanation as to how and why the management projections were changed from less than a month before or any quantification of the financial impact of these changes.

52. Based on these "updated" projections, PJSC prepared its analysis which was presented to and reviewed by the Board on November 25, 2013. Specifically, representatives of

PJSC reviewed with the Board management's five-year financial projections both excluding potential acquisitions and including assumed acquisitions. RG Barry is not a prolific acquirer with its last acquisition being in 2011. The Proxy fails to provide any explanation what these "potential" and "assumed" acquisitions are referring to or how they affected PJSC's analysis.

53.     During the November 25, 2013 Board meeting PJSC provided their valuation summary for the Company based on various analyses including, among others, precedent transactions and a discounted cash flow ("DCF") analysis – the underlying assumptions of which have not been disclosed. They also discussed potentially available alternatives to a sale of RG Barry and a "detailed analysis of the present value of future stock price appreciation that could result from each of these strategies."

54.     However, when the Board asked PJSC whether to begin an auction or market check process to determine whether any strategic or other financial buyers might be willing to pay more than Mill Road, PJSC shot the idea down. Based on Mill Road's position that they would not participate in an auction – a position that neither PJSC nor the Company attempted to negotiate – and without any other discernible basis, PJSC expressed the view that the $20 Proposal was not likely to be exceeded by any other party. PJSC and the Company attempt to justify this further by stating that it would have been "expected" that the public announcement of the $20 Proposal would have resulted in any other potential buyers coming forward. However, what the Board and PJSC apparently neglected to consider was that there was a Rights Agreement in place that was adopted in response to Mill Road's initial, and very public, takeover attempt that certainly could have put off other suitors. PJSC's advice to not conduct an auction for the Company is unsurprising given the contingent fee PJSC stands to receive upon the successful completion of the Proposed Transaction.

55.     At the close of the meeting, the Board authorized PJSC to commence discussions with Mill Road and to permit Mill Road to conduct due diligence with respect to the $20 Proposal, subject to Mill Road signing a confidentiality and standstill agreement.  The Board also instructed PJSC to request that Mill Road increase its offer above $20.00 per share.

56.     In response to the request to increase the price, Scharfman of Mill Road explained to PJSC that Mill Road was not in a position at that time to increase its offer, but that after conducting its due diligence it might be in a position to do so.  Rather than push or negotiate the point, PJSC capitulated.

57.     The interests of the Company's public shareholders, along with the Board's fiduciary duty to secure a fair value for shareholders, were not a priority for the Board.  For example, during the Company's February 4, 2014, 2Q / 1st half 2014 conference call following the Company's announcement of its 2Q 2014 financial earnings, a representative of Cove Street had the following exchange with Defendant Tunney:

> **Jeff Bronchick [of Cove Street]**: And in regard to the quote, unquote, "process," I know there's things you can and cannot say.  However, I do think there are things you can say.  And so my first question would be is this process –what the special committee does – is it occupying 100% of the time in that you are not simultaneously and additionally looking at acquiring the acquisition program to plan the next Bagallini or are the two totally independent?

> **Greg Tunney**: That's a good question.  I would tell you right now that our whole modus operandi when this took place on September 11 of last year was to – and it was by direction of the Board – was that we needed to operate as normal, and that's the thing that we've tried to do the best.  And as you saw in my comments today, the Board has set up a special committee.  They're focused with our investment banker.  ***We don't want to be distracted in this process***.  We think we've got a good investment banker and we think the special committee is very in touch with shareholders and what's best for our Company going forward.  So that's been the relationship and the process and that's how we want to keep it.

> **Jeff Bronchick [of Cove Street]**:  ***I would tell you that the special committee, if they are listening, and they probably are, has not done a good job of being in contact with the shareholders.***  And my point being that what one can articulate has not – in a process like this, is very simply is – my question would be, ***"Is the special committee specifically looking at this bid as the opportunity or no? Or is***

*this a full-blown process to explore all strategic options in the best interests of shareholders?" That's what seems to be missing or is unclarified and has not been committed or is not been publicly stated by the special committee.*

So I would appreciate any comment you, or anyone who's listening, may have or some further announcement post the call or in the Q that would clarify that statement because that's a doable and appropriate statement for shareholders.

(emphasis added).

58.     On February 17, 2014, after conducting its business due diligence, Mill Road confirmed via letter to the Board its proposal to acquire, pursuant to a merger, the remainder of the Company's outstanding shares that it did not already own at a price of $20.00 per share, in cash.  Once again, there is no indication that PJSC or the Board even attempted to negotiate a higher price than the initial $20 offered by Mill Road back in September 2013.

59.     On February 20, 2014, the Board convened a telephonic meeting to discuss Mill Road's proposal.  As described in the Proxy, no effort was made to engage other potential suitors in order to drive the highest value for shareholders by placing competitive bidding pressure on Mill Road with PJSC advising that it "did not believe it would be fruitful or prudent for [the] Company to look for other buyers at that time."

60.     In responding to questions from the Board about whether to explore alternative transactions which might yield a higher price for RG Barry's shareholders and whether the Board should seek a higher offer price from Mill Road, PJSC simply "reminded" the Board that they had already answered the questions previously and that it was unlikely the Company would find another buyer and that they had already asked Mill Road for a higher price which was not agreed to.  Once again, no attempt was made to negotiate better terms for the merger.

61.     PJSC attempted to buttress their argument that seeking a higher price from Mill Road would be unsuccessful by noting that the Company's projected fiscal 2014 and 2015 earnings had dropped from the median of Wall Street analyst estimates as reported by Thompson

Reuters on September 11, 2013, the date of Mill Road's $20 Proposal. However, at that point Mill Road had already completed its business due diligence and was surely aware of the Company's projected earnings yet, at that point, it had not dropped its offer price. Once again it seems as if PJSC was more concerned with closing the deal and earning their fee than looking out for the Company's best interests.

62.     Furthermore, the Proxy gives no discernible basis for PJSC to state that they did not believe it would be "fruitful or prudent for [the] Company to look for other buyers" at that time. This opinion is belied by the fact that another possible acquirer did come forward once the go-shop period commenced. It seems as if PJSC's sole concern was getting the Proposed Transaction approved rather than trying to get the best deal and price for RG Barry's public shareholders.

63.     In addition, during the February 20, 2014 Board meeting it was first disclosed that Defendant Tunney had contacted several financial parties in the summer of 2013 in an unsuccessful effort to organize a management-led buyout of the Company. The Proxy fails to disclose any details of Defendant Tunney's efforts including whether they occurred prior to, or after, September 11, 2013 when Mill Road made their $20 Proposal, the number of financial parties that were contacted, and the number of these parties that expressed interest in an acquisition of the Company.

64.     On April 29, 2014, Scharfman of Mill Road called PJSC and outlined certain concerns, primarily relating to costs associated with the Company's long-term incentive plans and deterioration in 2015 financial projections, that Mill Road had developed while completing its confirmatory due diligence. He stated that, given these concerns, Mill Road's investment committee was only prepared to move ahead with the acquisition at a price of $18.75 per share, a reduction of $1.25 per share from the original $20.00 per share offer price.

65.     Rather than engaging potential suitors to create a competitive bidding environment with Mill Road, the Board capitulated to Mill Road by countering their $18.75 proposal with $19.50.  This counter proposal was rejected by Mill Road who would only move forward at $19.00 per share, which represents a mere 13.0% premium over the $16.82 per share closing price of the Company's common shares on September 10, 2013, the last trading day before Mill Road announced the $20 Proposal.  After the approximately eight month "process," rather than negotiating a fair value for the Company's public shareholders, the Board negotiated a $1.00 *lower offer price* from Mill Road and, in a breach of its fiduciary duties, the Board agreed to the inadequate $19.00 Merger Consideration.

**The Proposed Transaction**

66.     On May 1, 2014, the Board unanimously authorized and approved the Merger Agreement, the ancillary agreements and the amendments to the Company's Rights Agreement. The Board also directed that the adoption of the merger agreement be submitted for consideration by the shareholders of RG Barry at a special meeting, and unanimously recommended that the shareholders vote in favor of the adoption of the Merger Agreement

67.     On May 2, 2014, RG Barry and Mill Road issued a joint press release announcing the Proposed Transaction.  The press release stated, in pertinent part:

> PICKERINGTON, Ohio, May 2, 2014 /PRNewswire/ -- Accessories marketer R.G. Barry Corporation (Nasdaq: DFZ) and Mill Road Capital, a private equity firm, announced today the signing of a merger agreement pursuant to which Mill Road will acquire all of the outstanding shares of R.G. Barry Corporation for $19.00 per share in cash, reflecting an equity value of approximately $215 million. The merger will result in R.G. Barry becoming a wholly-owned subsidiary of a newly-formed corporation controlled by Mill Road.
>
> The $19.00 per share cash merger price represents a premium of 18% compared to the 30-day average price of the stock prior to the announcement of Mill Road's initial proposal on September 11, 2013, and is 67% higher than the 52-week low and 6% higher than the 52-week high, prior to the announcement.
>
> The R.G. Barry Board of Directors unanimously approved the merger agreement and the merger, consummation of which is subject to customary closing

conditions, including adoption of the merger agreement by R.G. Barry's shareholders and the expiration of the waiting period or other approval under the Hart-Scott-Rodino Antitrust Improvements Act. Concurrently with entering into the merger agreement, Mill Road also entered into a voting agreement to vote its 9.8% stake in R.G. Barry in favor of the transaction. The merger is expected to close during the third calendar quarter of 2014, barring unforeseen circumstances and assuming that no other bidders present themselves.

\* \* \*

R.G. Barry also announced that its Board of Directors, as required by the merger agreement, has suspended the payment of the regular quarterly dividend so long as the merger agreement is in effect.

**The Excluded Party Bidder**

68.     At the May 1, 2014 Board meeting, the Board also authorized the commencement of the "go-shop" process in an attempt to cure the lack of any market check in the sales process to Mill Road. During the 30-day "go-shop" period that ended on May 31, 2014, a total of 31 potential acquirers were contacted, comprised of 10 strategic parties and 21 financial parties, which the Board and PJSC believed might be interested in a possible transaction. This process proved the inadequacy of the Merger Consideration when, on May 5 at the very beginning of the go-shop period, one of the Company's primary competitors (the "Excluded Party") contacted PJSC and indicated a willingness to make an offer to acquire all of RG Barry's outstanding common shares. It is unclear whether the Excluded Party was even one of the 31 parties contacted by PJSC during the process.

69.     Following the execution of a confidentiality agreement, the Excluded Party proceeded with their due diligence. On May 16, 2014, PJSC sent a letter to the Excluded Party on behalf of the Board setting out the "procedures and guidelines" for making a takeover proposal. Among the numerous requirements demanded by the Board, was a demand for any takeover agreement to contain a so-called "hell or high water provision" requiring the Excluded Party and its subsidiaries and affiliates to:

- 20 -

(i) use [their] respective best efforts, and take any and all actions necessary, to secure promptly all approvals required from governmental entities with respect to the transaction, including actions to divest, license, hold separate or otherwise dispose of, or allow a third party to utilize, any portion of [their] respective businesses, assets or contracts and (ii) take any and all other actions that may be required by any governmental entity in connection with obtaining such approval.

70. On May 28, 2014, the Excluded Party sent a letter containing a non-binding proposal, subject to additional due diligence, to acquire 100% of RG Barry's fully-diluted common shares at a price per share of $21.00 (the "Alternative Proposal"). ***This represents a premium of $2.00 - or 10.5% - over the price per share offered by Mill Road.***

71. The letter also stated that it would expect to be ready to sign a definitive agreement within three weeks and estimated that a closing would occur during the first half of September 2014. It also stated that the Alternative Proposal had received all necessary board and other authorizations.

72. The Alternative Proposal also stated that the Excluded Party was prepared to sign a definitive agreement that would include substantially the same terms as the Merger Agreement with Mill Road and it would be financed with a combination of equity and debt. The letter included debt commitment letters from the Excluded Party's lenders. No additional conditions or approvals would be required to complete the transaction beyond those identified in the merger agreement with Mill Road and that the Excluded Party did not anticipate any regulatory conditions or other required approvals except for customary Hart-Scott-Rodino Antitrust ("HSR" or "HSR Act") approval.

73. However, in response to the Board's requirement that the definitive agreement contain a hell or high water provision, the Alternative Proposal stated as follows:

"We are considering a 'hell or high water HSR provision' in the definitive agreement as well as other potential approaches to give the Board sufficient closing certainty; however we need to do some additional work around our anti-trust analysis. We expect to concurrently finalize our HSR review during the period we are finalizing our confirmatory due diligence."

- 21 -

74.     In response to the Board's continued insistence on a hell or high water provision, the Excluded Party notified the Board that it and its counsel were continuing to examine the antitrust risk but, based on their review of the data, they believed that the risk was low.  The letter also stated the Excluded Party's belief that there were other ways to address the antitrust risk that should be considered and discussed by the Board before it completed its evaluation of the Alternative Proposal.

75.     The Board met on June 2, 2014 to "review, discuss and consider the Alternative Proposal."  The Board identified and discussed four basic concerns it had with the Alternative Proposal:

> (i) the antitrust risks presented by the Alternative Proposal; (ii) [the Excluded] Party['s] [] plan for financing the Alternative Proposal; (iii) concerns about providing competitively-sensitive information to a competitor; and (iv) the importance of implementing measures to retain key employees between the date of announcement of the Alternative Proposal and the date of its completion given that consummation of the Alternative Proposal would likely result in a reduction in our employee headcount.

76.     In addition, the Board engaged antitrust counsel to analyze potential antitrust risks associated with the Alternative Proposal and authorized antitrust counsel to retain an economist to assist it.  Antitrust counsel indicated it should be able to provide its analysis to the Board by June 13, 2014.

77.     After consulting with PJSC and their legal counsel, the Board was forced to determine that, pursuant to Section 5.2 of the Merger Agreement: (i) the Alternative Proposal was or could reasonably be expected to result in a "Superior Proposal," and (ii) the third party that submitted the Alternative Proposal is an "Excluded Party."  That same day the Board provided Mill Road with a copy of the Alternative Proposal, as required by the Merger Agreement.

78.     Despite the 10.5% premium to Mill Road's offer price being offered, the Board also concluded that because of the concerns outlined above it was not yet a "Superior Proposal." The "independent" directors also noted that, after antitrust counsel had completed its review and analysis of, and briefed the Board on, the antitrust risks; the Board might be persuaded that the hell or high water provision was not necessary.

79.     In an effort to allay the Board's concerns, on June 5, 2014, the Excluded Party sent a letter that revised the Alternative Proposal by conceding nearly every concern to the Company and, unlike Mill Road, without lowering its offer price as a result.  Specifically, in order to alleviate the Board's concerns about:

- the provision of sensitive information to the Excluded Party, it would remove its request for information that was reasonably determined to be competitively-sensitive, including information regarding the names of vendors and information about specific customer programs or marketing plans;

- the retention of key employees upon announcement of a transaction with the Excluded Party, it would work with the Company to develop a stay bonus program which would reward employees who remain with us through the completion of the transaction with the Excluded Party; and

- the risk that the Alternative Proposal would not close for antitrust reasons, it would agree to pay a termination fee of $15 million – as opposed to the $5 million termination fee agreed to with Mill Road – if the transaction was not completed due to a failure to obtain antitrust approval, as well as for the same trigger events included in the merger agreement with Mill Road.

80.     The Excluded Party also stated that in their view, after having performed further analysis, the antitrust risk of the transaction was remote.  Furthermore, even if there was a chance that the Alternative Proposal would be scrutinized, the Excluded Party bore the greater risk because their losses that would result from a government-mandated divestiture of a product line could be catastrophic.  On the other hand, the 10.5% purchase premium was a significant reward to the Company's shareholders for a small incremental risk that the Alternative Proposal would not close due to antitrust reasons.

81.     In response to the Excluded Party capitulating on nearly every issue, PJSC and the Board proceeded to tear down the Alternative Transaction.  With no apparent basis, PJSC claimed that the trading price of the Company's shares could be expected to drop to $14 or lower if the Excluded Party terminated its definitive agreement and that the resulting loss of market capitalization, the $5 million termination fee payment to Mill Road and the other costs of the transaction could result in a total loss to the Company and its shareholders of over $65 million.

82.     On June 13, 2014, the Board received a written report of the antitrust counsel's analysis of the Alternative Proposal.  On June 16, 2014, the Board held a telephonic meeting to discuss the antitrust counsel's analysis.  Despite the $2.00 per share premium and $15 million termination fee, the "independent directors" directed PJSC to advise the Excluded Party that the Company would require a hell or high water provision in any definitive agreement with the Excluded Party.

83.     The next day, on June 17, 2014, the Excluded Party advised PJSC they would not agree to a hell or high water provision.  Later that evening, without any further attempt to negotiate with the Excluded Party or to leverage the Alternative Proposal for additional consideration for the Company's public shareholders, the "independent directors" determined that "(i) the Alternative Proposal was no longer reasonably expected to result in a Superior Proposal and (ii) Party A no longer qualified as an Excluded Party."

**The Individual Defendants' Self-Interest in the Proposed Transaction**

84.     In light of RG Barry's bright future, RG Barry was in a position to effectively bargain in order to receive higher bids for the Company, as the directors' fiduciary duties demand.  The Board failed to do so.

85.     Defendants' motive for entering into the flawed transaction is clear.  They are motivated to secure monetization for their illiquid equity holdings in the Company, and to secure

other change-in-control benefits that are only available to them if the Company is acquired. Importantly, Defendants are eager to avoid an embarrassing activist shareholder takeover in light of Mill Road's increased ownership.  These motives provided Defendants with the incentive to push forward with the Proposed Transaction instead of conducting a pre-signing sale process, pursuing the $21 Alternative Proposal from the Excluded Party, or exploring the Company's stand alone options.

86.     For example, Defendant Tunney and certain members of the Company's management team will potentially secure the following golden parachute awards if the Proposed Transaction is consummated:

**Potential Change in Control Payments to Named Executive Officers**

| Name (1) | Cash (2) ($) | Equity (3) ($) | Pension/ NQDC (4) ($) | Perquisites/ Benefits (5) ($) | Total (6) ($) |
|---|---|---|---|---|---|
| Named Executive Officers : | | | | | |
| Greg Tunney | 1,841,000 | 1,769,109 | 150,000 | 26,804 | 3,786,913 |
| Jose Ibarra | 426,300 | 587,613 | — | 13,402 | 1,027,315 |
| Glenn Evans | 316,400 | 390,583 | — | 13,402 | 720,385 |
| Lee Smith | 315,000 | 497,667 | — | 13,402 | 826,069 |

87.     In addition, Defendant Tunney and certain members of the Company's management team will secure immediate vesting and monetization of the following illiquid equity-based awards:

| | Estimated Aggregate Number of Performance RSUs & Performance Cash Award Units (1) | Aggregate Number of Time-Based RSUs (2) | Resulting Consideration (3) |
|---|---|---|---|
| Named Executive Officers: | | | |
| Greg Tunney | 43,434 | 49,677 | $ 1,769,109 |
| Jose Ibarra | 14,688 | 16,239 | $ 587,613 |
| Glenn Evans | 8,812 | 11,745 | $ 390,583 |
| Lee Smith | 9,990 | 16,203 | $ 497,667 |
| All Other Executive Officers as a Group: | 13,373 | 14,336 | $ 526,471 |

**The Materially Misleading Proxy**

88.    In order to secure shareholder approval of the inadequate Proposed Transaction, Defendants caused the Proxy to be filed with the SEC on June 12, 2014.   The Proxy misrepresented and/or omitted material information necessary for RG Barry's public shareholders to make an informed decision on whether to vote in favor of the Proposed Transaction or seek appraisal of their shares in violation of sections 14(a) and 20(a) of the Exchange Act.   Specifically, as set forth below, Defendants failed to provide the Company's shareholders with material information and/or provide them with materially misleading information concerning: the process by which the Board entered into the Proposed Transaction; (ii) the key data and inputs underlying the financial valuation analyses that purport to support the Fairness Opinion provided to the Company's Board by PJSC; and (iii) certain financial projections prepared by RG Barry and relied upon by PJSC in issuing its Fairness Opinion regarding the Proposed Transaction.

*The Sale Process Leading to the Proposed Transaction*

89.    The Proxy's "Background of the Merger" states that Mill Road made an offer for the Company in 2008 that the Board rejected in December 2008, but did not disclose publicly until March 16, 2009.  The Proxy fails to indicate if the Company hired another financial advisor at this time (or prior to Mill Road's September 2013 offer) to evaluate the offer and if so, who it was and why that advisor was not retained in connection with the 2013 offer. The Proxy also fails to explain the significant delay in issuing the press release detailing the Board's rejection of the Mill Road 2008 offer.

90.    The Proxy states that on September 11, 2013, the Board received an offer from Mill Road to acquire the Company for $20.00 per share, but it fails to disclose to Company's share price at this time although it does so based on the September 2008 Mill Road offer.

Similarly, the Company does not disclose the Company's share price when Mill Road (and any other entities if they exist, including the possible offer from management) made its subsequent proposal, and the Board made its counter-proposals.

91.     Although the Board created a "Special Committee" to facilitate the negotiation and coordinate with Mill Road in 2013, it does not indicate how the Special Committee was selected.

92.     The Proxy reveals that the Board investigated Mill Road's ability to finance since September 2013 and certain agreements were required as part of the Proposed Transaction. However, the Proxy does not explain why the Board questioned Mill Road's ability to finance the $20 Proposal from the beginning.  The partial disclosures on this topic indicate that this information was pivotal to the Board's decision to proceed and should be more fully explained to RG Barry's shareholders.  Also the Proxy does not explain how much of Mill Road's offer would be funded as equity versus debt beginning in October 2013

93.     The Proxy indicates that management created five year projections in October 2013 that were updated just a month later and included assumptions regarding acquisitions. However, the Proxy fails to disclose when the projections were provided to Mill Road and why and how they were updated in November 2013.  The Proxy also does not disclose why these assumptions were made regarding the hypothetical acquisitions given RG Barry's limited history of making acquisitions and if they were companies that RG Barry was considering acquiring or if they were truly hypothetical.  The Proxy also fails to disclose the Company's acquisition strategy and any impact that the negotiations with Mill Road had on this and the Company's business plans.

94.     The Proxy states that on November 25, 2013, PJSC evaluated Mill Road's offer, but does not explain why this was done ahead of providing Mill Road with any due diligence so

that it could confirm its offer.  The Proxy also does not explain the basis for PJSC's view that "the $20.00 price was not likely to be exceeded" by another bidder, which is particularly important because the Company did not conduct a sales process, but did receive the Alternative Proposal through the go-shop.

95.     The Proxy states that the Board discussed certain provisions regarding the structure of the Proposed Transaction, but does not fully disclose whether the Board considered or presented to Mill Road any alternatives to the go-shop, including but not limited to conducting a limited or confidential sales process, market check or two-tiered termination fee providing for a reduced fee if the Company accepted a Superior Proposal.

96.     The Proxy discloses that its Chairman and former CEO, Gordon Zacks, died on February 1, 2014.   However, the Proxy does not reveal any impact this had on the Company, its share price and if the Company was conducting a search for another director as this may have affected the Company's valuation during the negotiations of Mill Road.

97.     The Proxy indicates that during the summer of 2013, Defendant Tunney pursued a management buyout of the Company and approached certain financial parties about it.  The Proxy does not provide important information about this potential offer such as if a formal offer was made, if so, for how much, what parties were involved, the Board's knowledge of such offer and any evaluation of it.  This material information is especially significant here as it suggests that conflicts of interest may have existed during the negotiations with the Mill Road among management, including but not limited to any agreements concerning any confidentiality agreements with standstill provisions that may have been put in place and restricted management or other parties from making competing offers for the Company.  This is also important because Mill Road indicated in October 2013 that it was interested in retaining the current management team.  It is also unclear what financial parties may have approached by management, received

certain inside information, and may have been bound by certain agreements from making competing offers to the Company.  The Proxy also fails to reveal if these parties were included in the go-shop outreach efforts and how this may have impacted the market check.   This information is also significant based on the Board's decision to not pursue a sale process or market check ahead of agreeing to the Proposed Transaction with Mill Road. The Proxy also does not make clear if the Company received any other indications of interest from third parties interest in acquiring RG Barry during 2013-14.

98.     The Proxy states that the Board authorized discretionary bonuses ahead of the deal, but fails to state why it felt that this unusual step was necessary and if they were considered similar retention agreements especially significant because Mill Road indicated early on it wanted to retain management.  The Proxy does not disclose if the Board discussed this with Mill Road or if any other employment agreements were discussed.

99.     The Proxy discloses that Mill Road's consultant contacted the Company's customers, but does not state if this was part of the due diligence process.  This is significant as it may have impacted the Company's relationship with its customers.

100.    The Proxy states that the Board determined not to pay cash dividends as scheduled, but does not state why. This information is material to shareholders in understanding how the negotiations with Mill Road and the Proposed Transaction impacted the payment of dividends that they may be owed.

101.    The Proxy states that Mill Road cited the costs associated with the Company's long-term incentive plan and "deterioration in 2015 financial projections" as the reasons for lowering its offer by $1.25 per share or $14 million on April 29, 2014.  However, the Proxy fails to disclose what these costs were or explain the deterioration referred to by Mill Road, which is significant because the Board accepted Mill Road's offer of $19 per share, a dollar below its

initial $20 per share offer, without conducting a sale process or market check to determine the intrinsic value of the Company.   The Proxy also does not disclose when Mill Road was informed of the Company's 2015 financial expectations.

102.     The Proxy also does not explain why the Board accepted Mill Road's $19 per share offer before receiving PJSC's financial analyses regarding it or consideration of alternatives available that may have achieved higher value for shareholders including as a standalone entity; any sale of its assets; and any sum of parts analyses.

103.     The Proxy states that the Board and Mill Road agreed to a go-shop in connection with Proposed Transaction and later disclosed in a press release that thirty parties were contacted during the go-shop resulting in the receipt of the Alternative Proposal that may have resulted in a Superior Proposal that it declined to pursue on June 18, 2014.  The Proxy fails to disclose if the Board discussed the limitations of the go-shop, including but not limited to a shortened amount of time for a party to make offer and conduct due diligence and the payment of the $5 million termination fee.

104.     The Company filed an amendment to the Proxy on June 23, 2014, providing information regarding the Excluded Party's Alternative Proposal.  The updated Proxy states that the Excluded Party signed a confidentiality agreement in a form similar to its agreement with Mill Road.  However, the Proxy fails to disclose whether this confidentiality agreement included a standstill agreement or "don't ask, don't waive" provision that prevents the Excluded Party from asking for a waiver of the standstill agreement in order to make an alternative transaction.

105.     The Proxy also does not state whether any other parties during the go-shop also signed confidentiality agreements or were provided with any due diligence.  The Board requested that PJSC indicate to the Excluded Party that it was critical that it complete the transaction within a timely basis, but it is unclear if the Company provided an outside date for this to the Excluded

Party.  Similarly, it is unclear when the Board informed the Excluded Party of its concerns of providing certain competitive information to it and also concerns with retaining its employees.

106.    The updated Proxy states that the Alternative Proposal would include terms similar to the merger agreement with Mill Road, but subject to certain exceptions set forth in a memorandum.  The Proxy does not disclose what those exceptions were.  The Proxy does not state whether the Excluded Party shared its antitrust analysis with RG Barry.

107.    The Proxy indicates that Mill Road received certain information about the Excluded Party's Alternative Proposal but fails to fully and fairly disclose what was provided to Mill Road from the Excluded Party and the Board regarding its deliberations with the Excluded Party.  The Proxy also does not state whether the Board received any other offers that it determined were not "Alternative Proposals" and if Mill Road stated if it would increase its offer in connection with the Excluded Party's Alternative Proposal.  All of this information is very material to RG Barry shareholders in deciding whether to vote for the Proposed Transaction.

### PJSC's Valuation Analyses and Conflicts of Interest

108.    The Proxy provides certain financial information and financial analyses performed by PJSC in connection with the Proposed Transaction.  This information is significant to shareholders in deciding how to vote on the Proposed Transaction because was used by PJSC in issuing its Fairness Opinion and to provide shareholders with information on the valuation of the Company that they should be compensated.  Therefore, RG Barry shareholders are entitled to complete and accurate information regarding this, which was omitted in the Proxy.

#### Selected Publicly Traded Company Analysis

109.    The Proxy fails to provide a valuation summary with RG Barry's fully diluted shares outstanding, cash, debt, equity value (at the unaffected price and the Proposed Transaction

price), enterprise value (at the unaffected price and the Proposed Transaction price). The Proxy also does not indicate if pricing multiples were calculated, and if so, what they were.

110. The Proxy also does not disclose objective selection criteria and the observed company-by-company pricing multiples and financial ratios examined by PJSC. The Proxy fails to indicate if other multiples examined and if so, what they were.

111. The Proxy fails to disclose the ranges of indicated values per share corresponding to the selected multiples.

112. The Proxy does not explain and quantify adjustments made, who made them and why they were necessary.

113. The Proxy fails to explain how the estimated ranges of the implied equity value per share were applied to the projected metrics and why this was done.

114. The Proxy also does not disclose the source, selection criteria, number of transactions, and summary statistics underlying the control premium analysis.

### *Selected Precedent Transactions Analysis*

115. The Proxy fails to disclose objective selection criteria and the transaction-by-transaction enterprise values, pricing multiples and financial ratios. The Proxy also does not state whether other multiples examined and if so, what they were.

116. The Proxy does not indicate the ranges of indicated values per share corresponding to the selected multiples.

117. The Proxy fails to explain and quantify all adjustments and indicate who made them.

*Discounted Cash Flow Analysis*

118.    The Proxy fails to explain why the additional financial projections prepared by PJSC that included the hypothetical acquisitions were necessary, as well as the assumptions underlying the acquisitions and the reason such assumptions were appropriate.

119.    The Proxy does not explain the use of a range of 6.5x-8.5x for the terminal EBITDA multiples, when 7.5x-10.0x was used for public companies and 7.0x-9.0x was used for precedent transactions.

120.    The Proxy fails to discuss and display the information examined by PJSC regarding historical pricing multiples.

121.    The Proxy fails to identify, quantify and source the WACC assumptions used by PJSC.

122.    The Proxy indicates PJSC's conclusions regarding the DCF results and fails to disclose the range of indications provided by the DCF itself.

*Present Value of Future Stock Price Analysis*

123.    The Proxy fails to identify, quantify and source the assumptions used by PJSC with respect to RG Barry's cost of equity.

124.    The Proxy indicates PJSC's conclusions regarding the Present Value of Future Stock Price ("PVFSP") results, but fails to disclose the range of indications provided by the PVFSP itself.

125.    The Proxy does not explain why no transaction premium was applied to these results despite the fact that this analysis otherwise results in a minority-level indication of value. By contrast, the public companies analysis (which also provides minority-level value indications) was adjusted for a transaction premium.

*Projected Financial Information*

126.    The Proxy does not indicate if all projections provided to Mill Road, the Excluded Party or any other third parties during the go-shop.

127.    The Proxy does not disclose EBITDA and unlevered free cash flow (and/or the components thereof, such as depreciation and amortization, interest expense).

128.    The Proxy fails to disclose the assumptions regarding the hypothetical acquisitions and the reasons for them, which is especially material here as it impacts the Company's projections and valuation in connection with the Proposed Transaction.

129.    The Proxy also fails to disclose Unlevered Free Cash Flow in connection with the different projections.

130.    All of the above referenced information, which is conspicuously absent from the Proxy, is material to RG Barry shareholders and is necessary to them in order to analyze the value of the RG Barry and determine whether to vote in favor of the Proposed Transaction.

**The Unfair Deal Protection Devices**

131.    In addition to concerns regarding the inadequate sale process and the materially misleading Proxy, the Merger Agreement features several provisions that work to preclude other bidders from stepping forward with a superior alternative offer.  At best, these provisions place shareholders in an unfortunate position and, at worst, question the impartiality of the Board in the negotiation process.

132.    First, despite a limited "go shop" period, the Merger Agreement includes a "no solicitation" provision which impairs the ability of the RG Barry Board to secure an offer that adequately captures the inherent value of the Company and adequately compensates RG Barry's shareholders for their ownership interest in the Company.  Specifically, after the Go-Shop Period End Date, section 5.2(a) of the Merger Agreement prohibits the Board and any Company

personnel from soliciting, initiating, facilitating or encouraging alternative proposals in an attempt to procure a price in excess of the amount offered by Mill Road.  In conjunction with the matching rights and termination fee discussed below, the no solicitation provision will deter any potential buyers from making a competing bid.

133.    Similarly, section 5.2(e) of the Merger Agreement provides an "information rights" provision whereby following the Go-Shop Period End Date, the Company must notify Mill Road of any unsolicited competing bidder's offer within 24 hours.  Then, if and only if the Board determines that the competing offer warrants a "Change in Recommendation" section 5.2(f) grants Mill Road "matching rights," providing Mill Road five business days to amend the terms of the Merger Agreement so that the competing offer ceases to be a Superior Proposal (as defined in the Merger Agreement).

134.    The foregoing provisions have the effect of ensuring that no other company will put forth a competing offer because their offer would be immediately communicated to Mill Road, giving Mill Road an informational advantage against any competing proposal as well as the ability to match any competing bid.

135.    Defendants have also agreed to a termination fee, which may require RG Barry to pay a termination fee of $5 million to Mill Road in the event that the Company decides to pursue another offer – including any offer that results from the go shop process – thereby requiring that the alternate bidder agree to pay a naked premium for the right to provide RG Barry shareholders with a superior offer.

136.    As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of RG Barry's assets and business and will be prevented from obtaining the intrinsic value of their equity ownership of the Company.

137. Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

138. Plaintiff and the other members of the Class are immediately threatened by the wrongs complained of herein, and lack an adequate remedy at law.

## THE FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

139. By reason of the Individual Defendants' positions with the Company as officers and/or directors, they are in a fiduciary relationship with Plaintiff and the other public shareholders of RG Barry and owe them unwavering duties of care, loyalty, good faith, and independence.

140. In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in corporate control, the directors must take all steps reasonably required to secure a fair value for shareholders and disclose all material information concerning the proposed change of control to enable the shareholders to make an informed voting decision. To diligently comply with this duty, the directors of a corporation may not take any action that:

   (a)  adversely affects the value provided to the corporation's shareholders;

   (b)  contractually prohibits them from complying with or carrying out their fiduciary duties;

   (c)  discourages or inhibits alternative offers to purchase control of the corporation or its assets;

   (d)  will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders; or

(e)      violates their fiduciary duties or compromises their loyalty, including by putting their interests before the interests of RG Barry's shareholders.

141.    The Individual Defendants, separately and together, in connection with the Proposed Transaction, violated their duties owed to Plaintiff and the other public shareholders of RG Barry to secure a fair value for shareholders in a sale of the Company.  As a result of the Individual Defendants' divided loyalties, neither Plaintiff nor the Class will receive adequate or fair value for their RG Barry common stock in the Proposed Transaction.

142.    Because the Individual Defendants are knowingly or recklessly breaching their duties of care, loyalty, good faith, and independence in connection with the Proposed Transaction, the burden of proving the inherent or entire fairness of the Proposed Transaction, including all aspects of its negotiation, structure, price and terms, is placed upon Defendants as a matter of law.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

143.    Plaintiff also brings this action derivatively in the right and for the benefit of RG Barry to redress injuries suffered, and to be suffered, by the Company as a direct result of the violations of state law by Defendants, including breaches of fiduciary duty and the violations of federal law by the Defendants.

144.    Plaintiff will adequately and fairly represent the interests of RG Barry and its shareholders in enforcing and prosecuting its rights.

145.    Plaintiff has not made demand on the Board to file suit for the violations of state and federal law alleged herein because such a demand was a futile and useless act, particularly for the following reasons:

(a)      All of the directors on the Board are named as wrongdoers and defendants in this lawsuit;

(b)     All of the directors on the Board are alleged to have committed violations of federal and state law for which they are accountable to the Company and to the Company's shareholders;

(c)     Each of the key officers and directors knew of and/or directly benefitted from the wrongdoing complained of herein, including over $8.6 million in the monetization of performance-based restricted stock units ("RSUs"), performance based cash award units, time-based RSUs, stock options, deferred share units, and golden parachute compensation only if the Proposed Transaction is consummated;

(d)     Each Defendant approved the unfair Proposed Transaction at issue in this matter;

(e)     Each Defendant was in possession of non-public information regarding the Proposed Transaction and the material omissions and misleading disclosures at issue in this litigation;

(f)     Each Defendant reviewed the Proxy before it was disseminated:

(g)     Each Defendant was responsible for the disclosures and omissions in the Proxy;

(h)     Each Defendant recommended that the Company's shareholders vote in favor of the unfair Proposed Transaction in the Proxy;

(i)     Each Defendant ordered the dissemination of the Proxy to the Company's shareholders;

(j)     Each Defendant is violating the individual rights of the Company's shareholders to make a fully informed vote on the Proposed Transaction by disseminating a flawed Proxy;

(k)     In order to bring this suit, all of the directors of RG Barry would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(l)     The acts complained of constitute violations of the fiduciary duties owed by RG Barry officers and directors and these acts are incapable of ratification;

(m)     Any suit by the directors of RG Barry to remedy these wrongs would likely expose the Individual Defendants and RG Barry to further civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(n)     Each member of the Board is, directly or indirectly, the recipient of remuneration paid by the Company, including benefits, stock options and other emoluments by virtue of their Board membership and control over the Company, the continuation of which is dependent upon their cooperation with the other members of the Board, and their participation and acquiescence in the wrongdoing set forth herein and are therefore incapable of exercising independent objective judgment in deciding whether to bring this action; and

(o)     Because of their association as directors of the Company and their positions as present or former employees, the directors are dominated and controlled so as not to be capable of exercising independent objective judgment.

146.    Plaintiff has not made any demand on RG Barry shareholders to institute this action since such demand would be futile and useless action for the following reasons:

(a)     RG Barry is a publicly traded company with over 11 million shares outstanding and thousands of shareholders;

(b)      Making demand on such a number of shareholders would be impossible for Plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)      Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

**COUNT I**

**On Behalf of Plaintiff for Violations of §14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants**

147.    Plaintiff brings this Exchange Act claim on behalf of itself as an individual only.

148.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

149.    Individually and in concert, the Individual Defendants and RG Barry disseminated the false and misleading Proxy specified above, which contained statements that, in violation of §14(a) and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary in order to make the statements therein not materially false or misleading.

150.    The Proxy was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy.

151.    The Individual Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

152.    The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view a full and accurate

disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

153.     By reason of the foregoing, the Company and the Individual Defendants have violated §14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

154.     Because of the false and misleading statements in the Proxy, Plaintiff and other RG Barry shareholders are threatened with irreparable harm, rendering money damages inadequate.   Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

## COUNT II

### On Behalf of Plaintiff for Violations of §20(a) of the Exchange Act
### Against the Individual Defendants

155.     Plaintiff brings this Exchange Act claim on behalf of himself as an individual only.

156.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

157.     The Individual Defendants acted as controlling persons of RG Barry within the meaning of §20(a) of the Exchange Act as alleged herein.   By virtue of their positions as officers and/or directors of RG Barry and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

158.     Each of the Individual Defendants as controlling persons of RG Barry was provided with or had unlimited access to copies of the Proxy and other statements alleged by

Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

159.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in the making of the Proxy.

160.    By virtue of the foregoing, the Individual Defendants have violated §20(a) of the Exchange Act.

161.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated §14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are jointly and severally liable to Plaintiff pursuant to §20(a) of the Exchange Act.  Plaintiff has no adequate remedy at law.

## COUNT III

### Class Claim for Breach of Fiduciary Duties Against the Individual Defendants

162.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

163.    By the acts, transactions and courses of conduct alleged herein, the Individual Defendants are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in RG Barry.

164.    By the acts, transactions and courses of conduct alleged herein, the Individual Defendants have violated their fiduciary duties by contractually preventing themselves from

obtaining higher offers from other interested buyers and attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in RG Barry.

166. By the acts, transactions and courses of conduct alleged herein, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the Class.

166. As demonstrated by the allegations above, the Individual Defendants have breached their duties of care, loyalty, good faith, and independence owed to the public shareholders of RG Barry because, among other reasons, they have failed to take steps to ensure the Merger Consideration reflects the fair value of RG Barry to its public shareholders and/or are attempting to improperly put their personal interests ahead of the interests of RG Barry shareholders.

167. As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they will not receive their fair portion of the value of RG Barry's assets and businesses and will be prevented from obtaining fair value for their investment.

168. Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, to the irreparable harm of the members of the Class.

169. Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which the Individual Defendants' actions threaten to inflict.

## COUNT IV

### Derivative Claim for Breach of Fiduciary Duties Against the Individual Defendants

170. Plaintiff repeats all previous allegations as if set forth in full herein.

171.     Plaintiff brings this claim derivatively on behalf of RG Barry.

172.     The Individual Defendants owed the Company certain fiduciary duties as fully set out herein.

173.     By committing the acts alleged herein, the Individual Defendants have violated the fiduciary duties of care, loyalty, good faith, and independence owed to the Company and public shareholders of RG Barry and have acted to put their personal interests ahead of the interests of the Company and RG Barry's shareholders.

174.     By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive the Company, Plaintiff and other members of the Class of the true value inherent in and arising from RG Barry.

175.     The Individual Defendants have violated their fiduciary duties by entering RG Barry into the Merger Agreement without regard to the effect of the Proposed Transaction on the Company and its shareholders.

176.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward the Company, Plaintiff and the other members of the Class.

177.     As a result of the Individual Defendants' unlawful actions, the Company, Plaintiff and the other members of the Class will be irreparably harmed in that they will be deprived of the fair value of RG Barry's assets and operations.  Unless the Proposed Transaction is enjoined by the Court, the Individual Defendants will continue to breach their fiduciary duties owed to the Company, Plaintiff and the members of the Class, will not engage in arm's-length negotiations on the Proposed Transaction terms and may consummate the Proposed Transaction, all to the irreparable harm of the Company, Plaintiff and members of the Class.

178.    The Company, Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can the Company, Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

**COUNT V**

**Derivative Claim for Violations of §14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants**

179.    Plaintiff repeats all previous allegations as if set forth in full herein.

180.    Plaintiff brings this claim derivatively on behalf of RG Barry.

181.    Individually and in concert, the Individual Defendants and RG Barry disseminated the false and misleading Proxy specified above, which contained statements that, in violation of §14(a) and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary in order to make the statements therein not materially false or misleading.

182.    The Proxy was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy.

183.    The Individual Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

184.    The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

185.     By reason of the foregoing, the Individual Defendants have violated §14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

186.     Because of the false and misleading statements in the Proxy, the Company is threatened with irreparable harm and with the interference of proper governance on its behalf that follows the free and informed exercise of the shareholders' right to make an informed vote regarding a corporate merger.  Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Declaring this action to be a properly maintainable as a class and derivative action;

B.     Declaring that the Merger Agreement was entered into in breach of the Individual Defendants' fiduciary duties and is therefore unlawful and unenforceable;

C.     Declaring that Defendants herein, and each of them, have violated §§14(a) and/or 20(a) of the Exchange Act, as well as Rule 14a-9 promulgated thereunder;

D.     Preliminarily and permanently enjoining Defendants and all those acting in concert with them from consummating the Proposed Transaction until the Company and the Individual Defendants disclose all material information regarding the Proposed Transaction;

E.     Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of RG Barry's shareholders until the process for the sale or auction of the Company is completed and the highest possible value is obtained;

F.     In the event that the Proposed Transaction is consummated, rescinding it or awarding actual and punitive damages to Plaintiff and the Class;

G.      Implementation of a constructive trust, in favor of Plaintiff, upon any benefits improperly received by Defendants as a result of their wrongful conduct;

H.      Awarding Plaintiff fees and expenses in connection with this litigation, including reasonable attorneys' and experts' fees and expenses; and

I.      Granting such other and further relief as the Court deems just and proper.


DATED: June 24, 2014

                                                   /s/ John C. Camillus
                                                   John C. Camillus              (0077435)
                                                   Law Office of John C. Camillus, LLC
                                                   P.O. Box 141410
                                                   Columbus, Ohio  43214
                                                   (614) 558-7254
                                                   (614) 559-6731 (Facsimile)
                                                   jcamillus@camilluslaw.com

                                                   *Counsel for Plaintiff*

OF COUNSEL:

WEISSLAW, LLP
Richard A. Acocelli (pro hac vice forthcoming)
Michael A. Rogovin (pro hac vice forthcoming)
Kelly C. Keenan (pro hac vice forthcoming)
1500 Broadway, 16th Floor
New York, New York 10036
Tel.:  (212) 682-3025
Fax:  (212) 682-3010
racocelli@weisslawllp.com
mrogovin@weisslawllp.com
kkeenan@weisslawllp.com

*Counsel for Plaintiff*

## JURY DEMAND

Plaintiffs request a trial by jury.

                                                   /s/ John C. Camillus
                                                   John C. Camillus

- 47 -